No. 22-3577

In the
# United States Court of Appeals
## for the Sixth Circuit

———————

JACQUELYN BERRY,

*Plaintiff-Appellant,*

v.

UNITED STATES POSTAL SERVICE,

*Defendant-Appellee.*

———————

On Appeal from the United States District Court
for the Southern District of Ohio
No. 2:20-cv-05327 (Jolson, M.J.)

———————

**BRIEF FOR DEFENDANT-APPELLEE UNITED STATES
POSTAL SERVICE**

———————

For the Appellee:

KENNETH L. PARKER
United States Attorney

KEVIN KOLLER
Assistant United States Attorney
221 E. Fourth Street
Cincinnati, Ohio 45202
(513) 684-3711

# TABLE OF CONTENTS

Table of Authorities ..................................................................iii

Statement Regarding Oral Argument ...................................... vi

Statement of Jurisdiction........................................................ 1

Issues Presented ...................................................................... 2

Statement of the Case ............................................................. 3

    A.  Factual background .................................................... 3

        1.  Berry accepts a position as a temporary supervisor ........... 3

        2.  The Postal Service has reasonable, established time-keeping procedures ................................................. 4

        3.  Berry fails to record her time worked on October 10, 2017 ................................................. 7

        4.  Berry initiates a grievance, which the union investigates and determines to be false................................................. 10

        5.  The Postal Service returns Berry to her normal carrier position ................................................. 14

        6.  Berry submits inconsistent affidavits in an EEO proceeding ................................................. 16

    B.  Procedural history .................................................... 17

Summary of the Argument .................................................... 23

Argument ................................................................................ 27

    I.   Berry was not denied any overtime wages................................. 27

A.  There is no evidence Berry worked uncompensated overtime on October 10, 2017 ..............................................29

B.  The Postal Service had no reason to know of any alleged additional overtime because Berry refused to follow the Postal Service's reasonable timekeeping procedures ........34

II.  The Postal Service did not retaliate against Berry for engaging in protected activity ....................................................41

A.  Berry did not engage in protected activity .........................42

B.  There is no direct evidence of retaliation. .........................47

C.  Berry cannot establish retaliation based on circumstantial evidence ......................................................49

1.  The decision to return Berry to her normal position was not causally connected to her grievance ...............50

2.  The undisputed evidence establishes that the Postal Service had a legitimate, nondiscriminatory reason for returning Berry to her normal position..................52

3.  The Postal Service's proffered reason was not pretextual ......................................................................55

III.  Berry's claims are untimely ...................................................59

Conclusion.............................................................................................63

Certificate of Compliance .......................................................................64

Designation of Relevant District Court Documents ...............................65

Certificate of Service ..............................................................................66

# TABLE OF AUTHORITIES

Cases:

*Abbot v. Crown Motor Co.*, 348 F.3d 537 (6th Cir. 2003)........................ 47

*Adair v. Charter Cty. of Wayne*, 452 F.3d 482
    (6th Cir. 2006).............................................................. 49–50, 51, 55

*Bormuth v. Cty. of Jackson*, 870 F.3d 494 (6th Cir. 2017)...................... 27

*Brock v. City of Cincinnati*, 236 F.3d 793 (6th Cir. 2001) ...................... 34

*Carrethers v. McCarthy*, 817 F. App'x 88 (6th Cir. 2020) ........... 53, 55, 61

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................... 27

*Chen v. Dow Chem. Co.*, 580 F.3d 394 (6th Cir. 2009)........................... 55

*Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382 (6th Cir. 2016) ..... 38

*Fuelling v. New Vision Med. Labs.*, 284 F. App'x 247
    (6th Cir. 2008).......................................................................... 53, 57

*Herm v. Stafford*, 663 F.2d 669 (6th Cir. 1981) ...................................... 44

*Hill v. United States*, 751 F.2d 810 (6th Cir. 1984) ................................ 34

*Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169
    (6th Cir. 2008)................................................................................ 59

*Jenkins v. Regents of the Univ. of Mich. Health Sys.*,
    763 F. App'x 545 (6th Cir. 2019)..................................................... 44

*Jones-Turner v. Yellow Enter. Sys., LLC*, 597 F. App'x 293
    (6th Cir. 2015)................................................................................ 38

*Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394
    (6th Cir. 2015)...................................................................... 43

*Kappen v. Ashley Med. Supply, Inc.*, 695 F. App'x 94 (6th Cir. 2017)....53

*Kenney v. Aspen Techs., Inc.*, 965 F.3d 443 (6th Cir. 2020) ................... 51

*Ladd v. Grand Trunk W. R.R., LLC*, 552 F.3d 495 (6th Cir. 2009) ....... 53

*Loftis v. United Parcel Serv.*, 342 F.3d 509 (6th Cir. 2003)................... 44

*McDaniel v. Transcender, LLC*, 119 F. App'x 774 (6th Cir. 2005). ........ 41

*McDonald v. UAW-GM Ctr. for Human Resources*, 738 F. App'x 848
    (6th Cir. 2018)...................................................................... 52

*MacEachern v. Quicken Loans, Inc.*, No. 17-1005,
    2017 WL 5466656 (6th Cir. Oct. 17, 2017) .............................. 35, 61

*McKinnon v. L-3 Comm'n Corp.*, 814 F. App'x 35 (6th Cir. 2020).......... 42

*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988)........................ 59

*Pettit v. Steppingstone, Ctr. for the Potentially Gifted*,
    429 F. App'x 524 (6th Cir. 2011).................................. 41, 47, 49, 56

*Parada v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62
    (2d Cir. 2014). ..................................................................... 60

*Rhinehimer v. U.S. Bankcorp Invs., Inc.*, 787 F.3d 797
    (6th Cir. 2015)...................................................................... 43

*Sloan v. Am. Brain Tumor Assocs.*, 901 F.3d 891 (7th Cir. 2018).... 42, 46

*Spiteri v. AT & T Holdings, Inc.*, 40 F. Supp. 3d 869
    (E.D. Mich. 2014)................................................................. 42

*Tingle v. Arbors at Hilliard*, 692 F.3d 523 (6th Cir. 2012).................... 56

iv

*Viet v. Le*, 951 F.3d 818 (6th Cir. 2020). .......................................... passim

*Warren v. Ohio Dep't of Public Policy*, 24 F. App'x 259
    (6th Cir. 2001) ................................................................................. 45

*Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463 (6th Cir. 2012) ......... 51

*White v. Baptist Mem. Health Care Corp.*, 699 F.3d 869
    (6th Cir. 2012) ........................................................................... passim

*Wood v. Mid-America Mgmt. Corp.*, 192 F. App'x 378
    (6th Cir. 2006) ............................................................................. 28, 38

*Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634
    (6th Cir. 2015) ................................................................................. 43

Statutes:

28 U.S.C. § 1291 ..................................................................................... 1

28 U.S.C. § 1331 ..................................................................................... 1

29 U.S.C. § 201 ........................................................................................ 1

29 U.S.C. § 207 ..................................................................................... 27

29 U.S.C. § 215 ................................................................................. 41, 42

29 U.S.C. § 255 ..................................................................................... 59

Other authorities:

Fed. R. Civ. P. 56 .................................................................................. 27

## STATEMENT REGARDING ORAL ARGUMENT

The facts and legal arguments of the parties are adequately presented in the briefs and the record. Oral argument is therefore unnecessary.

## STATEMENT OF JURISDICTION

Jurisdiction was proper in the district court under 28 U.S.C.

§ 1331 because Plaintiff-Appellant Jacquelyn Berry alleged violations of

the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*. The district court

entered summary judgment in favor of Defendant-Appellee on June 6,

2022. Berry filed a timely notice of appeal on July 1, 2022. This Court

has appellate jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Whether the district court erred in granting summary judgment in favor of the United States Postal Service on Berry's failure-to-pay overtime claim.

2. Whether the district court erred in granting summary judgment in favor of the United States Postal Service on Berry's retaliation claim.

3. Whether summary judgment for the United States Postal Service was in any event required on both of Berry's claims based on her failure to comply with the two-year statute of limitations applicable to non-willful violations.

# STATEMENT OF THE CASE

Plaintiff-Appellant Jacquelyn Berry appeals the district court's grant of summary judgment in favor of Defendant-Appellee the United States Postal Service ("Postal Service"). On appeal, she claims that the Postal Service failed to pay her overtime earned on October 10, 2017, and retaliated against her for filing a union grievance, but has abandoned her claim that the Postal Service failed to pay her overtime for days other than October 10, 2017.

A. *Factual background*

1. Berry accepts a position as a temporary supervisor.

Berry started working at the Postal Service in 1989 as a mail carrier. (R. 27, Berry dep. at 82–83.)[1] In late 2016, Berry reached out to Kelley Harris, with whom she had previously worked as a carrier, about serving as a 204b temporary supervisor. (*Id.* at 100; R. 32-2, Harris decl. at 699.) 204b supervisor positions are temporary assignments for craft employees (*i.e.*, hourly, non-management employees such as

---

[1] Citations to those parts of the record that have been electronically filed include the record entry number, a brief description, and the PAGE ID#.

carriers or clerks) to serve as entry-level supervisors. (R. 32-2, Harris decl. at 700; R. 27, Berry dep. at 94.) Employees assigned as 204b supervisors retain their craft employee status and eligibility for overtime. (R. 32-2, Harris decl. at 700.) The assignments do not have a guaranteed duration and can be terminated at any time. (R. 32-2, Harris decl. at 700.)

Harris, who was then serving as a station manager, offered Berry a temporary assignment as a 204b supervisor under her at the South Columbus Station. (R. 32-2, Harris decl. at 700.) Berry accepted and began working under Harris in January 2017. (*Id.*) Berry's standard workday was nine hours with a one-hour break. Her start and end times varied. If she was the opening supervisor, she generally worked 7:00 a.m. to 4:00 p.m. with a one-hour lunch break. (*Id.*) As the closing supervisor, she generally worked from 11:00 a.m. to 8:00 p.m. also with a one-hour lunch break. (*Id.*)

2. The Postal Service has reasonable, established time-keeping procedures.

The Postal Service uses an automated, web-based system—the Time and Attendance Collection System (TACS)—to track and record all time and attendance information for postal employees throughout

4

the country. (R. 32-4, Eichelbrenner decl. at 712–13.) The system requires that all craft employees, including 204b supervisors, swipe their work badge at an Electronic Badge Reader (EBR) to record the hours they worked. (*Id.*) Employees must make four swipes to complete their daily "clock rings": (1) Begin Tour (BT); (2) Out to Lunch (OL); (3) In from Lunch (IL); and (4) End Tour (ET). (*Id.* at 714.)

The EBR consists of a large digital clock on top and a bottom portion that includes a swipe channel and various entry keys. (*Id.* at 713.) Employees swipe their badge from right to left across the channel. If the swipe is successful, the EBR makes an audible ring to indicate the time was recorded properly. (*Id.*) If the employee fails to swipe the badge correctly, however, the EBR emits a different, louder and longer, noise to indicate to the employee that the time was not properly recorded. (*Id.*) If the EBR is not functioning, and unable to record time, the large digital clock on top of the EBR will be blank, and the EBR will emit no sound when a badge is swiped. (*Id.*)

Employees cannot enter their own time in TACS in any way other than swiping their badge in the EBR. (*Id.* at 714.) An employee who fails to swipe her badge in the EBR is in "clock ring error." (*Id.* at 714–

5

15.) When this occurs, a supervisor must enter the employee's time manually or else the employee will not be paid for that day. (*Id.*; R. 27, Berry dep. at 173.) The employee must submit a PS Form 1260 to her supervisor to document the time she worked. (R. 32-4, Eichelbrenner decl. at 714–15.) The responsibility always lies with the employee, not the supervisor, to submit the PS Form 1260. (*Id.*; *see also id.* at 722.)

TACS retains a comprehensive record of all entries and edits to an employee's time records. When a supervisor edits the time records to fix an error or deletes an entry, TACS preserves the original data and stores data on any edits or deletions—including when they were made and by whom. (*Id.* at 714–15.) Managers and 204b supervisors can access an employee's full time and attendance data, including data on any edits, through the Employee Everything Report. (*Id.* at 716; R. 37-1, Eichelbrenner decl. II at 1162.)

Berry's time records indicate that she frequently failed to swipe her badge in the EBR to make her clock rings. (R. 32-4, Eichelbrenner decl. at 717; *see also* R. 27, Berry dep. at 136; R. 32-2, Harris decl. at 700.) In her deposition, Berry identified various reasons for this, including that she did not always have her badge. (R. 27, Berry dep. at

6

136, 139–40.) She also acknowledged that it is the employee's responsibility to submit a PS Form 1260 to correct a clock ring error and that, in some circumstances, a supervisor might start the process to fix a clock ring and rely on the employee to submit documentation later. (*Id.* at 152, 173–74.)

Berry's time records indicate that the Postal Service compensated Berry for all overtime that she reported: During her nine months as a 204b supervisor under Harris, the Postal Service paid Berry for nearly 400 hours of overtime.[2] (*See* R. 32-4, Eichelbrenner decl. at 716–17, 732–810.)

3. Berry fails to record her time worked on October 10, 2017.

Harris asked Berry to work on Tuesday, October 10, 2017, because Harris anticipated the post office would be busier than normal that day. (R. 27, Berry dep. at 187; R. 32-2, Harris decl. at 701.) Berry agreed to

---

[2] The Postal Service distinguishes between regular overtime and penalty overtime. Regular overtime is paid at a rate of 1.5 times the employee's normal hourly rate and is coded under 053/5300 on an employee's time records. (R. 32-4, Eichelbrenner decl. at 716.) Penalty overtime is paid at a rate of twice the employee's normal hourly rate and is coded under 043/4300. (*Id.*) Tabulating the overtime listed on Berry's time records under the two codes indicates she was paid for 312 hours of regular overtime and 87 hours of penalty overtime during her time as a 204b supervisor under Harris. (*See id.* at 716–17, 732–810.)

work, and Harris verbally authorized Berry to work eight hours of overtime with a one-hour lunch break.[3] (R. 32-2, Harris decl. at 701–02; *see also* R. 27, Berry dep. at 218.) Because October 10, 2017, was the second scheduled day off that Berry worked that week, she was entitled to penalty overtime for any time worked.

Berry came to work in the morning but failed to swipe her badge or otherwise record her Begin Tour time. (R. 32-4, Eichelbrenner decl. at 718.) Neither Berry nor any other employee reported any issues with the EBR. (R. 27, Berry dep. at 207.) Berry successfully swiped her badge when she went out to lunch at 1:57 p.m. and when she returned from lunch at 3:09 p.m. (R. 32-4, Eichelbrenner decl. at 718.) Berry, however, failed to swipe her badge or otherwise record her End Tour time when she left work later that afternoon. (*See id.* (explaining that the "zeros in the 'EBR #' column" indicate that Berry "failed to make her clock rings for both the Begin Tour and End Tour"); *id* at 805 (Berry's time records for October 10, 2017); *see also* R. 27, Berry dep. at 206 (agreeing that

---

[3] While managers generally authorize overtime in advance, an employee is always paid for overtime regardless of whether it is authorized or unauthorized. (R. 32-2, Harris decl. at 704; R. 32-4, Eichelbrenner decl. at 722.)

her time records indicate she did not make an EBR ring).) In contrast, the other 204b supervisor successfully made all his clock rings on October 10, 2017. (R. 32-4, Eichelbrenner decl. at 719.)

Berry's failure to record her Begin Tour and End Tour times placed her in clock ring error. (R. 32-2, Harris decl. at 701.) Harris discovered Berry's clock ring error that evening and immediately corrected the error that evening to ensure that Berry would be paid for the overtime she worked. (*Id.*) Harris first entered a Begin Tour time of 6:00 a.m. and an End Tour time of 3:00 p.m. (*Id.*) Within a minute, she deleted those times and re-entered new times shifted back one hour: a Begin Tour time of 7:00 a.m. and an End Tour time of 4:00 p.m. (*Id.*) These times equated to an eight-hour overtime shift with a one-hour lunch break consistent with the amount of overtime Harris had authorized Berry to work that day. Because Berry clocked a one hour and 12-minute lunch, she was credited with a total of 7 hours and 48 minutes of penalty overtime for which she received double pay. (*Id.*; *see also* R. 32-4, Eichelbrenner decl. at 719, 805.) Berry did not receive a

full eight hours of overtime pay only because she took longer than an hour for lunch. (R. 32-2, Harris decl. at 702.)

The time records establish that Harris did not delete any of Berry's time on October 10, 2017, or on any other day. (R. 32-2, Harris decl. at 702; R. 32-4 Eichelbrenner decl. at 723–835; R. 37-1, Eichelbrenner decl. at 1150–51; R. 37-3, Brim decl. at 1172.) Rather, had Harris not corrected Berry's clock ring errors on October 10 and other days, Berry would not have been paid for the hours she worked. (R. 32-4 Eichelbrenner decl. at 717.)

4. <u>Berry initiates a grievance, which the union investigates and determines to be false</u>.

Berry noticed that edits had been made to her time on October 12, 2017, when she accessed her Employee Everything Report. (R. 27, Berry dep. at 178–80.) Berry sent a text message to Harris that evening, asking "Kelly did you change my clock rings because someone did." (*Id.*; R. 33-1, text message at 1063.) Harris does not recall ever receiving the text message and never sent a response, and Berry never sent any follow-up text messages. (R. 31, Harris dep. at 558.) While Harris recalls Berry "walking around the station loudly exclaiming that someone deleted her time," she stated that Berry never approached her

directly about the issue or informed her that she worked more than 7 hours and 48 minutes that day. (R. 32-2, Harris decl. at 702.)

Berry maintains that she asked Harris about the edits in person and that Harris replied she had no knowledge of them. (R. 27, Berry dep. at 180.) Berry does not claim, however, that she told Harris that she had worked more than the 7 hours and 48 minutes reflected in her time records. (*See id.* at 180, 272.) Berry also admits that she never submitted a PS Form 1260 to claim additional overtime upon learning of the edits to her clock rings. (*Id.* at 202–03.)

On October 13, 2017, Berry emailed her second-level supervisor Patrick LaRosa about the edits to her clock rings. (R. 27, Berry dep. at 233–35.) Berry sent two emails within minutes of each other. The emails stated her clock rings had been changed and asked who made the edits to the time records. (*Id.*) The emails did not assert that the records were inaccurate or that she worked longer than was reflected in the edited time records. (*Id.*; *see also* R. 27-9, emails at 1402–05.)

Berry filed a grievance through her union steward the next day. (R. 27, Berry dep. at 245; R. 32-5, grievance at 866.) The grievance asserted that management had violated the employee and labor

relations manual when "they deleted overtime rings" from Berry on October 10, 2017. (R. 32-5, grievance at 866.) Berry did not inform the union representative of any amount of overtime that had been deleted, and the grievance did not include any claim regarding an amount of overtime that was owed. (*See id.*; R. 27, Berry dep. at 254–55.) Moreover, Berry later testified that when she filed the grievance, she did not believe that *any* of her time had been deleted. (R. 27, Berry dep. at 245, 255.) Rather, she filed the grievance to find out who edited her clock rings. (*Id.*)

On October 27, 2017, Harris met with union representatives to formally review the grievance.[4] (R. 32-2, Harris decl. at 702–03.) Berry joined the meeting by phone. (R. 27, Berry dep. at 260.) Michael Brim, a union representative familiar with clock rings, examined Berry's time records at the meeting. (R. 28, Brim dep. at 460–62, 480.) He confirmed that Harris had not deleted or falsified Berry's time rings. (*Id.*) Rather, the records indicated that Berry had failed to clock in or out on October

---

[4] Typically, the grievant and union steward meet with the supervisor as part of the informal grievance process prior to the formal meeting. Berry, however, did not contact Harris to participate in this informal process, electing to meet with the union steward by herself. (R. 32-2, Harris decl. at 702–03.)

10. (*Id.*) Brim explained that the seven zeros under the EBR number on her time records indicated that Berry did not swipe her card when she began and left work that day. (*Id.*) Had she swiped in and out, the EBR number for the South Columbus Station where she swiped (EBR # 802-31) would have been listed next to her respective time entry, even if those records were later edited in a separate entry by someone else. (*Id.*; R. 32-4, Eichelbrenner decl. at 718.)

Brim attempted to explain to Berry at the meeting that she had not made her clock rings and that Harris had not falsified her records. (R. 28, Brim dep. at 460–62, 480.) Berry refused this explanation, however. She remained adamant that she had made her clock rings—and that Harris had deleted her time—despite the conclusive evidence to the contrary. (*Id.*; R. 32-2, Harris decl. at 703–04.) Berry argued that Harris had deleted her time because of statements Postmaster Ignatius Vaccaro had made on a conference call, on or around October 11, about the amount of penalty overtime being used. (R. 32-2, Harris decl. at 703–04.) Harris had already fixed Berry's clock error at the time Vaccaro made those comments, however. (R. 31, Harris dep. at 580.) And, in any event, Harris understood Vaccaro to be directing her to

13

limit the amount of overtime going forward, not to retroactively remove overtime that craft employees had already worked. (R. 32-2, Harris decl. at 704.)

Berry did not state in the meeting how much additional time she believed was owed. (*Id.*; *see also* R. 28, Brim dep. at 466–67.) When asked about submitting a PS Form 1260 to document the time she worked, she responded that she did not need to submit one because she had made her clock rings. (*See* R. 28, Brim dep. at 480; *see also* R. 32-5, Berry letter at 864.) The union determined on the conference call that the grievance was false based on the documentary evidence. (R. 37-3, Brim decl. at 1172; R. 32-2, Harris decl. at 704.) It elected not to pursue the grievance further, and it administratively closed the grievance approximately one week later on November 3, 2017. (R. 29, Peruzzi dep. at 505.)

5. <u>The Postal Service returns Berry to her normal carrier position</u>.

Due to the October 27 call, Harris concluded that she could no longer trust Berry because Berry had continued to persist in her false accusations that Harris had deleted her clock rings, even after being provided indisputable evidence that she had simply failed to clock in or

out on October 10. (R. 32-2, Harris decl. at 705.) Harris relayed her concerns to LaRosa. (*Id.*)

LaRosa met with Berry in person later in the day on October 27. At the meeting, he asked her to sign a PS Form 1260 documenting the time she worked on October 10. (R. 27, Berry dep. at 270.) According to Berry, LaRosa indicated that, if she did not "write down something," she would have to go back to working as a postal carrier at least until the investigation was closed. (*Id.* at 270–71, 275.) Berry refused to sign a PS Form 1260 or otherwise to state the time she worked on October 10. (*Id.*) She stated in her deposition that she did not submit any documentation because, at the time, she was uncertain of the hours she worked and was worried about the consequences of signing a form that did not accurately reflect the time she worked. (*Id.* at 271–72.)

The Postal Service ended Berry's temporary supervisory assignment and returned her to her position as a letter carrier the next day because of her persistence in making demonstrably false allegations that she made all her clock rings and that Harris had deleted her time. (R. 32-2, Harris decl. at 705; R. 31, Harris dep. at 565–66, 582.)

6. <u>Berry submits inconsistent affidavits in an EEO proceeding</u>.

Berry initiated an EEO administrative action in November 2017. (*See* R. 32-8, EEO pre-complaint at 934–36.) She alleged that the Postal Service discriminated against her based on her race and age when her clock rings were edited without her knowledge and that the Postal Service retaliated against her when it returned her to her normal non-supervisory position. (*See id*.; R. 32-5, EEO aff. at 840–83.) As part of her EEO case, Berry submitted a sworn affidavit she signed in February 2018. (*Id*.) In that affidavit, Berry stated that she was "not aware of [the] specific time" she arrived at work on October 10. (*Id*. at 843.) She also averred that she "was paid less money" on that day because "my time posted did not add up to 8 hours; it was posted as less." (*Id*. at 844.)

Two and a half years later, Berry submitted a new sworn affidavit in support of her response to the Postal Service's motion for summary judgment before the EEO administrative judge. (R. 32-9, second EEO aff. at 1029–34.) That affidavit, dated July 2020, repeated her debunked claims that she had properly made her Begin Tour and End Tour clock rings on October 10, 2017, and that Harris had deleted those times at

16

the behest of Postal Service management. (*Id.* at 1032–33.) She also indicated for the first time that she specifically recalled when she began work, stating that she "clocked in on that morning of October 10 a[t] 6:00 a.m." (*Id.*) The affidavit was silent as to the time she left work. (*See id.*)

The administrative law judge granted summary judgment in favor of the Postal Service, and Berry did not pursue her EEO claim in federal court. (*See* R. 32-6, EEO dec. at 884–90.)

B. *Procedural history*

Berry filed suit in federal court on October 9, 2020—just under three years after the underlying events occurred. (R. 1, complaint at 1–10.) The complaint alleges that Harris began deleting Berry's overtime in March 2017, that Berry properly clocked in using her badge on October 10, 2017, and that Harris changed Berry's October 10 clock rings to "reflect different, shorter hours of work." (*Id.* at 3.) The complaint asserts two claims under the Fair Labor Standards Act ("FLSA"): (1) that the Postal Service willfully failed to pay Berry

17

overtime and (2) that the Postal Service willfully retaliated against her for reporting FLSA violations.[5] (*Id.* at 5–6.)

The complaint repeats Berry's allegation, first made in June 2020, that she clocked in for work at 6:00 a.m. on October 10, 2017. (*Id.* at 3.) While the complaint does not allege when she left work that day, Berry estimated in her deposition that she worked until "around 4:00 or 5:00 p.m." (R. 27, Berry dep. at 192–93). She admitted in her deposition, however, that she did not recall the specific times she worked and that she had no documentation to support her claims. (*See, e.g.*, *id.* at 230, 272 ("So I, myself, cannot pinpoint an exact time that I clocked in and clocked out.").) When asked how much time she believed was deleted on October 10, she responded "I don't know, I don't know." (*Id.* at 222.) She also indicated that she was "not sure" about the hours she worked and explained that this was why she never submitted a signed PS Form 1260. (*Id.* at 273.)

---

[5] While the complaint also references the Ohio Minimum Fair Wage Standards Act and the Ohio constitution (R. 1, complaint at 1), Berry subsequently dismissed all her state law causes of action. (R. 12, scheduling order at 40.)

Following discovery, the parties cross-moved for summary judgment. The Postal Service asserted that Berry's overtime claim failed because she had not alleged how much overtime she was owed, let alone adduced any evidence that she actually worked longer than 7 hours and 48 minutes on October 10. (R. 32, def.'s mot. at 680–83.) The claim also failed because Berry did not comply with the Postal Service's reasonable process for tracking time or otherwise make the Postal Service aware of any alleged uncompensated overtime. (*Id.* at 683–84.) The Postal Service also asserted that Berry could not make out a *prima facie* case of retaliation and that, in any event, her retaliation claim also failed because the Postal Service had returned Berry to her normal carrier position for a legitimate, nondiscriminatory, non-pretextual reason—namely, her persistence in making objectively false claims that Harris had deleted her clock rings. (*Id.* at 684–95.) Finally, the Postal Service asserted that both claims were untimely because Berry had not adduced any evidence of willful violations necessary to extend the FLSA's statute of limitations from two to three years. (*Id.* at 672–77.)

Berry asserted in her cross-motion that she had completed her clock rings on October 10, 2017 and that Harris, acting on instructions

from management, had willfully deleted her time. (R. 33, pltf.'s mot. at 1038–39.) Berry submitted an affidavit claiming she was entitled to an additional one hour and twelve minutes of overtime for her work on October 10. (*Id.* at 1041; *see also* R. 33-1, Berry aff. at 1084.) Berry also claimed Harris deleted her overtime on eight other dates for an additional lost 3 hours and 48 minutes of overtime. (R. 33, pltf.'s mot. at 1041.) Finally, Berry asserted that LaRosa's statements to her on October 27 constituted direct evidence of retaliation and that the Postal Service's proffered non-discriminatory reason was pretextual. (*Id.* at 1055.)

The district court granted the Postal Service's motion for summary judgment and denied Berry's cross-motion. (R. 43, op. & order at 1502–28.) The court held that the Postal Service was not liable for any alleged unpaid compensation because Berry had "failed to follow the established procedure for reporting time" and because she had not put forth "sufficient evidence with which a reasonable [factfinder] could find that she actually performed work for which she was not compensated on any of the dates in question." (*Id.* at 1518.) The undisputed evidence established that Berry had failed her obligation to

make her clock rings on October 10, 2017. (*Id.* at 1508.) Berry had also "never submitted a 1260 to create a supplemental record of her time worked," nor offered any evidence that she informally attempted to notify the Postal Service of any uncompensated time worked. (*Id.* at 1514.) Indeed, the court noted that Berry "has never, and still cannot, state with particularity the time she actually worked that day." (*Id.* at 1511.) The court also reviewed the additional eight dates on which Berry claimed unpaid overtime, concluding that a factfinder could likewise not find for her on those claims. (*Id.* at 1514–18.)

The district court found that Berry had not identified any direct evidence that the Postal Service had retaliated against her for engaging in protected activity. And even assuming Berry could make out a *prima facie* case of retaliation based on circumstantial evidence,[6] the Postal

---

[6] The district court noted that Berry "lacked an objectively reasonable belief Defendant was intentionally undercompensating her," and thus might not be able to carry her *prima facie* burden to show that she had engaged in protected activity. (R. 43, op. & order at 1521 n.2.) The court declined to resolve the retaliation claim on this ground, however, because the Postal Service raised the argument in its response to Berry's motion for summary judgment and not in its own summary judgment motion. (*Id.*) As such, the district court indicated that under Fed. R. Civ. P. 56(f)(2), reliance on this ground would first have required providing Berry notice and a further opportunity to respond. (*Id.*) Because the district court concluded that summary judgment for

21

Service was entitled to summary judgment because it had proffered a legitimate, non-discriminatory, non-pretextual reason for returning Berry to her normal position. Specifically, the undisputed evidence established that the Postal Service took action, not because Berry filed a grievance, but rather because she persisted in false allegations that her time had been deleted despite the objective evidence and her union's position to the contrary. (*Id*. at 1527). The court found that the Postal Service honestly believed that Berry's continued false accusations created a loss of trust that compromised the working relationship and that nothing in the record indicated that this belief was pretextual. (*Id*. at 1528.). This appeal ensued.

---

the Postal Service was appropriate on other grounds, it noted that this issue was "academic." (*Id*.)

# SUMMARY OF THE ARGUMENT

The district court correctly granted summary judgment in favor of the Postal Service on both claims. Berry's claim for uncompensated overtime fails for several reasons. First, she has not adduced any evidence that she worked more than the 7 hours and 48 minutes on October 10, 2017, for which she was compensated. She admitted at her deposition that she does not know how much time was allegedly deleted, that she did not believe that any time had been deleted when she filed her union grievance, and that she did not submit a PS Form 1260 to document her time because she was unsure of the hours she worked. She also signed a sworn statement in February 2018 indicating that she did not recall the specific time she began work that day and asserting that she was denied overtime only because she was paid less than eight hours. Berry offers no persuasive explanation sufficient to disclaim her prior sworn statement, and the undisputed evidence establishes that Berry was paid for less than eight hours only because she took an extended lunch break. As such, her conclusory assertions in opposing summary judgment—that she began her workday at 6:00 a.m.

23

and worked somewhere between 9 and 10 hours that day—do not create a genuine issue of material fact.

Second, Berry's overtime claim separately fails because she has not adduced any evidence that the Postal Service knew or should have known she worked more than 7 hours and 48 minutes on October 10, 2017. The Postal Service has implemented a reasonable process for employees to report any overtime. The undisputed evidence establishes that Berry failed to comply with this process and failed to put the Postal Service on notice of any additional time she might have worked through any other means. She did not make her required swipes to record her Begin Tour and End Tour times. Moreover, she never submitted a PS Form 1260 nor took any other steps to inform Harris or anyone else at the Postal Service of the times she believed she worked, even after claiming an issue with her time records.

Berry's retaliation claim likewise fails for multiple reasons. First, the claim fails at the outset, because the undisputed evidence makes clear that Berry did not have a good faith, objectively reasonable belief that the Postal Service had violated the FLSA when she filed her union grievance. Filing that grievance was therefore not protected activity.

24

Berry admitted that she did not subjectively believe that any overtime had been deleted when she filed the grievance. Rather, she filed the grievance to identify who edited her clock rings—an inquiry that does not implicate the FLSA in the absence of any basis to believe that the edits removed any overtime. Moreover, any belief that the Postal Service had denied her overtime would not have been objectively reasonable in light of the time records and Berry's inability to identify any additional time she worked. In the absence of FLSA protected activity, Berry cannot establish retaliation.

Second, even if Berry's grievance could be viewed as protected activity, there is no direct or circumstantial evidence that the Postal Service returned Berry to her normal position in retaliation for filing the grievance. Rather, the undisputed evidence establishes that the Postal Service acted for a legitimate, non-discriminatory, non-pretextual reason: Berry's persistence in making false claims despite objective evidence to the contrary caused a loss of trust and rendered Berry ill-suited to continue working as a temporary supervisor.

Finally, in any event, both of Berry's claims are untimely. Berry did not file suit until nearly three years after the underlying events

occurred. Because there is no evidence that the Postal Service willfully violated the FLSA, the FLSA's default two-year statute of limitations applies to, and bars, both claims.

# ARGUMENT

This Court reviews a district court's grant of summary judgment *de novo. Bormuth v. Cty. of Jackson*, 870 F.3d 494, 503 (6th Cir. 2017) (en banc). Summary judgment is warranted if "there is no genuine dispute as to any material fact" and the party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). While the evidence must be viewed in the light most favorable to the non-moving party, "'the plain language of Rule 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Bormuth*, 870 F.3d at 503 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)) (internal alterations omitted).

## I.   Berry was not denied any overtime wages.

The FLSA requires employers to pay employees overtime wages for any time an employee works over 40 hours per week. 29 U.S.C. § 207(a)(1); *Viet v. Le*, 951 F.3d 818, 822 (6th Cir. 2020). To prevail on a claim under the FLSA, a plaintiff must prove by a preponderance of the evidence both that she performed work for which she was not properly

27

compensated and that the employer knew or should have known about the unpaid overtime. *White v. Baptist Mem. Health Care Corp.*, 699 F.3d 869, 873 (6th Cir. 2012); *see also Wood v. Mid-America Mgmt. Corp.*, 192 F. App'x 378, 380 (6th Cir. 2006).

A plaintiff cannot rely on conclusory statements to create a genuine issue of fact that she worked uncompensated overtime. *See Viet*, 951 F.3d at 823–24. Nor can a plaintiff contradict prior sworn statements concerning the time she worked without providing a persuasive explanation for the contradiction. *White*, 699 F.3d at 877. Moreover, "if an employer establishes a reasonable process for an employee to report uncompensated work time, the employer is not liable for non-payment if the employee fails to follow the established process." *Id.* at 876. This is because an employee that fails to follow reasonable time-reporting procedures "prevents the employer from knowing its obligation to compensate the employee and thwarts the employer's ability to comply with the FLSA." *Id.*

Here, Berry's claim fails because she has not adduced any evidence showing either that she worked uncompensated overtime on

October 10, 2017, or that the Postal Service knew or should have known about any uncompensated overtime she purportedly worked.

A. There is no evidence Berry worked uncompensated overtime on October 10, 2017.

Berry has failed to adduce evidence, either in the administrative proceedings or in discovery, that she worked more than the 7 hours and 48 minutes for which the Postal Service paid her penalty overtime. Her assertions on appeal—that she began work at 6:00 a.m., worked until between 4:00 or 5:00 p.m., and is owed somewhere between one and two hours of unpaid overtime (Br. at 5–6)—are both conclusory and contradicted by prior sworn statements.

First, Berry's statements at her deposition are "too vague and conclusory to withstand summary judgment." *Viet*, 951 F.3d at 820. She stated in her deposition only that she "believe[d]" she arrived at work at 6:00 a.m. and that it was "around 4:00 or 5:00 p.m." when she left. (R. 27, Berry dep. at 192–93.) Additionally, she subsequently admitted that she did not know how much additional time, if any, she worked on October 10, 2017:

> Q: So what amount of time are you claiming was actually deleted?
> A: At this point I don't know, I don't know.

29

(*Id.* at 222.) Berry also admitted that, at the time she filed her union grievance on October 14, 2017, she did not believe that any overtime had been deleted. (*Id.* at 255.) This was just four days after the date in question and after Berry had reviewed her time records. She also stated in her deposition that she was not sure of the hours she had worked when she met with LaRosa on October 27, 2017, and that she did not sign a PS Form 1260 at that time because she did not want to "guesstimate" her hours. (*Id.* at 274–75; *see also id.* at 271–72 ("Because at this point I did not know . . . . I, myself, cannot pinpoint an exact time that I clocked in and clocked out. I just remember it was early morning.").) And at other points in the deposition, she appeared to backtrack on her claim that she was owed between one and two hours of overtime, asserting instead that her issue was that she was paid less than eight hours (*i.e.*, that she was owed a twelve-minute shortfall). (*See id.* at 225–27.) Because Berry's "deposition testimony would leave [a factfinder] simply guessing at the number of hours [s]he worked," it does not create a genuine issue of fact sufficient to survive summary judgment. *Viet*, 951 F.3d at 824.

30

Second, Berry's claims that she began work at 6:00 a.m. and is owed between one and two hours of overtime also contradict her prior sworn statement. In February 2018, she stated in an EEO affidavit that she had no specific recollection of the time she began work on October 10 and indicated that she was seeking to be paid for a total of eight hours of overtime for October 10, which represented twelve minutes more than she had already been compensated for. (R. 32-5, Berry EEO aff. at 843–44.) The first time Berry ever asserted that she recalled starting work at 6:00 a.m. was in an EEO affidavit filed in June 2020— over two years after swearing in her first EEO affidavit that she had no such recollection. (*See* R. 32-8, second EEO aff. at 926.) While Berry repeats this claim in the present litigation, she has never provided a persuasive explanation for the contradiction with her prior sworn statement. *See White*, 699 F.3d at 877 (holding that a plaintiff cannot disclaim a prior sworn statement absent a persuasive explanation for the contradiction). Indeed, when pressed on this at her deposition, she was unable to offer any explanation. (R. 27, Berry dep. at 196 (stating that she did not know why she did not include a specific start time in her EEO affidavit).) She also conceded that her 2018 affidavit was the

31

more reliable indicator of her claimed work: "I'm trying to remember back then, but this [affidavit] is a closer resemblance to what the issue was." (*Id.* at 226.)

Berry's qualified statements that she offers to explain her new start and end times are also insufficient to create a genuine issue of fact. Berry stated in her deposition that, while she did not recall what time she worked, she "believe[s]," that as the morning supervisor, she would have arrived at 6:00 a.m. to attend a morning teleconference call ("a telecom"). (*Id.* at 192, 196, 274; *see also* Br. at 6.) But she also testified that "there's a 6 o'clock Telecom, there's a 7 o'clock and an 8 o'clock. So that would be one source of finding out what time I came in." (*Id.* at 203, 274.) Harris clarified that the first morning telecom occurred that day at 7:00 a.m., approximately one hour before postal carriers started their routes. (R. 37-4, Kimble decl. at 1178). The 7:00 a.m. start time is consistent with the Begin Tour time Harris entered for Berry, based on the amount of overtime that Harris had told Berry she was authorized to work.

Berry likewise offers no evidence to support her claim that she worked past 4:00 p.m. on October 10, 2017. Her only explanation for her

position, expressed for the first time in litigation, is that, "if [she] remember[s] correctly," some postal carriers were returning to the station and the other 204b supervisor was present when she left for the day, "so that has to be about 4:00 or 5:00."[7] (R. 27, Berry dep. at 196.) Her vague and conditional recollection that she might have ended her tour anytime during this hour is insufficient to create a genuine dispute about her End Tour time. Indeed, by Berry's own estimate, she might have left work at 4:00 p.m., which is the time Harris entered for her, consistent with the authorized overtime, after Berry failed to make her End Tour clock ring.

Berry also fails to raise a genuine issue as to her claim from her 2018 affidavit that she was owed an additional twelve minutes of overtime. The undisputed evidence establishes that the alleged twelve-minute shortfall was because she took an extended, one-hour-and-twelve-minute lunch, not because Harris deleted any time. (*See* R. 32-4,

---

[7] Unlike Berry, the other 204b supervisor made all four of his clock rings that day. (R. 32-4, Eichelbrenner decl. at 719.) Crediting Berry's assertion (R. 27, Berry dep. at 196) that the other supervisor was present when she left work on October 10, 2017, does not narrow down her claim as the other supervisor clocked in at 10:57 a.m. and was present until he took his lunch break at 5:04 p.m. (R. 32-4, Eichelbrenner decl. at 838.)

Eichelbrenner decl. at 718, 805 (documenting that Berry swiped out for lunch at 1:57 p.m. and did not return until 3:09 p.m.).) In any event, even if this were not so, the twelve minutes is a *de minimis* amount of unpaid overtime that does not support an FLSA claim. *See Brock v. City of Cincinnati*, 236 F.3d 793, 804 (6th Cir. 2001) (noting that claims of a few minutes lost overtime are subject to *de minimis* exception and not compensable under the FLSA); *see also Hill v. United States*, 751 F.2d 810, 815 (6th Cir. 1984).

B. The Postal Service had no reason to know of any alleged additional overtime because Berry refused to follow the Postal Service's reasonable timekeeping procedures.

Even if Berry had adduced evidence to create a genuine dispute as to the amount of time she worked on October 10, 2017, her claim still fails because the Postal Service did not know or have reason to know that she worked more than 7 hours and 48 minutes that day.

The undisputed evidence establishes that the Postal Service had long-standing, reasonable procedures for employees to report any overtime and that Berry failed to follow these procedures. The Postal Service's timekeeping procedures require employees to swipe their badge at the EBR reader when they begin their tour, go to lunch, return

34

from lunch, and end their tour. (R. 32-4, Eichelbrenner decl. at 713–15, 721.) If an employee fails to make their daily clock rings for any reason or otherwise needs to adjust their time records, the responsibility lies with the employee to submit a PS Form 1260 to their supervisor. (*Id.*) Berry was aware of, and understood, these procedures. (R. 27, Berry dep. at 107–14, 152.) Moreover, when she followed these procedures— either swiping her badge or submitting a PS Form 1260—she was compensated for all overtime she reported, earning nearly 400 hours of total overtime in her nine months working as a 204b supervisor under Harris. (*See* R. 32-4, Eichelbrenner decl. at 716–17, 732–810.) *See White*, 699 F.3d at 877 (rejecting FLSA claim where employer established a system to compensate its employees and plaintiff was compensated when she used that system); *MacEachern v. Quicken Loans, Inc.*, No. 17-1005, 2017 WL 5466656, at *5 (6th Cir. Oct. 17, 2017) (same).

Berry's undisputed time records establish that she failed to make her swipes to begin her tour and to end her tour on October 10, 2017. (R. 32-4, Eichelbrenner decl. at 718, 805.) While Berry maintained in her motion for summary judgment that she completed her clock rings

(*see* R. 33, mot. at 1038–39), she concedes on appeal that she did not do so. (Br. at 14.) She now contends that the Postal Service system was unreasonable because she could not have known that the EBR did not record her swipes that day. (Br. at 14–16.) But she provides no record citation to support her claim that the EBR might have malfunctioned in a manner that could have escaped her notice. (*Id.* at 14.) To the contrary, the record evidence establishes that any EBR error would have been apparent at the time. The EBR emits a 'ding' sound based on a successful swipe and a louder, different noise if the swipe is not successful. (R. 32-4, Eichelbrenner decl. at 713.) Moreover, on those rare occasions when the EBR is down, it is readily apparent because the large clock on the reader is blank and there is no sound when an employee swipes a card. (*Id.*; *see also* R. 31, Harris dep. at 539.) Notably, there is no indication in the record that the EBR malfunctioned that day. Indeed, Berry was in a supervisory role that day, and she did not report any malfunctions and is unaware of any employees having issues. (R. 27, Berry dep. at 207.) Additionally, the EBR reader worked properly when Berry clocked out to and in from

lunch and when the other 204b supervisor made all four of his swipes that day. (*See* R. 32-4, Eichelbrenner decl. at 805, 838.)

Even if the EBR could have randomly malfunctioned in the unknowable manner that Berry claims without record support, that would not render the Postal Service's procedures unreasonable. The Postal Service's procedures provide a mechanism—the PS Form 1260—by which an employee can report time not captured by the EBR. Berry, however, never submitted a PS Form 1260 to document the additional time she now claims she worked, even after learning there had been an issue with her clock rings. Berry learned of the problem with her clock rings on October 12, 2017, when she accessed her time records. (*See* R. 27, Berry dep. at 179–80.) If she believed the start and end times entered by Harris were inaccurate, it was incumbent on her to submit a PS Form 1260 to inform the Postal Service of the additional times she worked. Berry did not do so, despite multiple invitations to document her time. (R. 27, Berry dep. at 202–03.) When her union stewards asked about a PS Form 1260 at the October 27 meeting, Berry indicated she would not be submitting one because she believed she had made her clock rings, even though the union stewards explained that this was not

the case. (*See* R. 28, Brim dep. at 466, 480; R. 32-5, letter at 864.) She also refused to sign a PS Form 1260 when she met with LaRosa because she was not sure what hours she worked. (R. 27, Berry dep. at 275.)

Nor did Berry take any other steps that would have provided the Postal Service actual or constructive knowledge of the time she claims she worked. (R. 32-2, Harris decl. at 702, 704.) Harris testified that she would have ensured Berry's pay reflected any increased hours, as she had done on previous occasions, if Berry provided notice of any additional time worked. (R. 31, Harris dep. at 581–82.) But because Berry did not do so, the Postal Service had no reason to believe that she worked any time beyond her authorized eight-hour overtime shift, minus twelve minutes for her extended lunch. *See Wood*, 192 F. App'x at 876; *Jones-Turner v. Yellow Enter. Sys., LLC*, 597 F. App'x 293, 298 (6th Cir. 2015) (affirming summary judgment where employer had established a reasonable process to report time and plaintiff had produced no evidence that employer had either constructive or actual knowledge of any uncompensated time); *cf. Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 390 (6th Cir. 2016) (holding that issue of fact existed as to employer's constructive knowledge of employee

38

overtime where employee kept "meticulous records" of the hours she worked, where she was working, and the tasks she completed and submitted those records to her employer each week for approval).

On appeal, Berry claims she should be entitled to a relaxed burden of proof on the grounds that the Postal Service time records are inaccurate. (Br. at 16–19.) This claim fails for several reasons. First, the relaxed burden only "applies to damages questions" and "only *after* an employee has met the initial burden to establish liability by showing that the employee performed uncompensated overtime work." *Viet*, 951 F.3d at 822 (quotation and alterations omitted) (emphasis in original). As noted *supra* Part I.A, Berry has not satisfied her initial burden—her conclusory assertions that she started at 6:00 a.m. and worked more than her authorized eight-hour shift contradict both her prior sworn EEO affidavit and her additional statements in her deposition that she did not know how much time she worked. *See Viet*, 951 F.3d at 825 (holding relaxed burden was inapplicable where plaintiff's conclusory assertions did not create genuine dispute of material fact).

Second, Berry's argument ignores that she did not comply with the Postal Service's reasonable time-keeping procedures. Even if she

could show inaccuracies in her time records from October 10, any inaccuracies exist because she failed to make her Begin Tour and End Tour clock rings and then refused to submit a PS Form 1260, even after she became aware of the issue with her clock rings on October 12. The Postal Service did not prevent her from reporting her time, and her claim that Harris "fabricated" and "falsified" her time records is completely unfounded. (Br. at 17.) The undisputed evidence establishes that Harris input time based on Berry's authorized overtime shift, only after Berry failed to make her swipes, to ensure that Berry got paid. (R. 32-2, Harris decl. at 701.) That Harris did not check with Berry prior to fixing the clock ring error does not affect the analysis. Harris did not delete any time that Berry entered. Moreover, Berry was provided multiple opportunities to clarify the hours she worked, and Harris would have amended the clock rings if Berry had informed her at any point that she had worked additional time. (R. 31, Harris dep. at 581–82.)

An employee is not entitled to a relaxed burden where, as here, the employee failed to report her time and never took steps to put the employer on notice that she worked additional overtime. *See White*, 699

40

F.3d at 876–77. Rather, the rule announced in *White* applies: Because Berry did not follow reasonable time-keeping procedures to report her overtime, the Postal Service had no reason to know about that claimed overtime and is not liable for any failure to pay. *Id.*

## II. The Postal Service did not retaliate against Berry for engaging in protected activity.

The FLSA prohibits employers from "discharg[ing] or in any other manner discriminat[ing] against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under [the FLSA]." 29 U.S.C. § 215(a)(3). An employee asserting retaliation must establish that she engaged in protected activity under the FLSA and that her employer took an adverse action against her because of that protected activity. *See Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. App'x 524, 529–30, 534 (6th Cir. 2011); *McDaniel v. Transcender, LLC*, 119 F. App'x 774, 779–80 (6th Cir. 2005).

Berry's retaliation claim fails because her union grievance was not protected activity under the FLSA and because, in any event, there is neither direct nor circumstantial evidence that the Postal Service retaliated against her for filing the grievance.

41

A. <u>Berry did not engage in protected activity</u>.

"An employee engages in protected activity when she 'file[s] any complaint or institute[s] or cause[s] to be instituted any proceeding under or related to' the FLSA." *McKinnon v. L-3 Comm'n Corp.*, 814 F. App'x 35, 42 (6th Cir. 2020) (quoting 29 U.S.C. § 215(a)(3)). A complaint is deemed filed if "a reasonable objective person would understand the employee to have put the employer on notice that she is asserting statutory rights under the FLSA." *Id.*

While this Court has not yet addressed the degree to which an employee's complaint must be sincere and reasonable to qualify as protected activity under the FLSA, other courts, including the Seventh Circuit (the only circuit to address this specific question) have established a two-part standard. Under that test, a complaint qualifies as protected activity under the FLSA only if (1) the employee holds a subjective, good faith belief that the complained about conduct violated the FLSA and (2) that belief is objectively reasonable. *Sloan v. Am. Brain Tumor Assocs.*, 901 F.3d 891, 895 (7th Cir. 2018); *see also Spiteri v. AT & T Holdings, Inc.*, 40 F. Supp. 3d 869, 876 (E.D. Mich. 2014) (applying same standard and collecting cases).

This Court has applied a similar standard to the anti-retaliation provisions of other statutes. For instance, an employee engages in protected conduct under Title VII only if she has "a reasonable and good faith belief that the opposed practices were unlawful." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 646 (6th Cir. 2015) (quoting EEOC Compliance Manual ¶ 8006). This inquiry includes subjective and objective components: the employee "must actually believe that the conduct complained of constituted a violation of relevant law" and it must be the case that "a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee would believe that the conduct complained of was unlawful." *Id.* (quotation omitted); *see also Rhinehimer v. U.S. Bankcorp Invs., Inc.*, 787 F.3d 797, 811 (6th Cir. 2015) (applying same standard to anti-retaliation provision of the Sarbanes-Oxley Act); *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394 (6th Cir. 2015) (applying same standard to anti-retaliation provision of the False Claims Act). This Court should apply the same standard here.

43

Berry fails both prongs of this standard.[8] First, the undisputed evidence establishes that she did not have a subjective, good faith belief that the Postal Service had wrongfully withheld overtime pay in violation of the FLSA when she filed her union grievance. Berry specifically admitted in her deposition that she did not believe that any time had been deleted:

> Q. At that point when you made the grievance did you think that time had been deleted?
>
> A. No, because it was still about who is changing—first it was who is changing my clock rings, whose number is this? So that would have been—because I still want to go to the

---

[8] The district court found that Berry could not meet this standard because the evidence established that she "lacked an objectively reasonable belief Defendant was intentionally undercompensating her." (R. 43, op. & order at 1521 n.2.) While the district court did not base its decision on this finding given the procedural posture and its holding on other issues (*see id.*), this Court "may affirm for any reason presented in the record, even if the reason was not raised below." *Loftis v. United Parcel Serv.*, 342 F.3d 509, 514 (6th Cir. 2003); *Jenkins v. Regents of the Univ. of Mich. Health Sys.*, 763 F. App'x 545, 551 & n.7 (6th Cir. 2019) (affirming summary judgment on ground not raised below). Even though the Postal Service did not raise the issue in its motion for summary judgment, it did so in its response to Berry's motion for summary judgment, arguing to the district court that Berry had failed to meet her *prima facie* burden to show she engaged in protected conduct. (R. 37, def.'s response at 1140–41.) Berry responded to this argument in her reply brief in support of her summary judgment motion (*see* R. 41, reply at 1474–75 (asserting that she "had a good faith subjective and objective basis for filing her grievance")) and may address the issue in her reply brief on appeal. *See Herm v. Stafford*, 663 F.2d 669, 684 n.21 (6th Cir. 1981).

> person who made the changes to my clock rings, I want to
> address them first. So when that didn't happen, the first
> question was who changed my clock rings, whose ID number
> is this? So that's, you know.

(R. 27, Berry dep. at 255.) Berry's testimony makes clear that she filed

the grievance to uncover who edited her clock rings, not to recover any

unpaid overtime. (*See id.* at 245 ("So we filed the grievance to find out

who's changing clock rings.").) Even if Berry subjectively believed that

Harris's decision to fix her clock ring error without a PS Form 1260

violated Postal Service policy, neither Harris's actions nor Berry's

grievance implicated the FLSA given that Berry did not believe any

overtime had been deleted. *Cf. Warren v. Ohio Dep't of Public Policy*, 24

F. App'x 259, 264 (6th Cir. 2001) (holding plaintiff's participation in

internal investigation did not constitute protected activity under Title

VII because that investigation did not include any allegations of

violations of Title VII rights).

Second, even if Berry had subjectively believed that the Postal

Service had failed to pay her overtime, that belief would not have been

objectively reasonable. At the time Berry filed the grievance, she had

already reviewed her time records. (R. 27, Berry dep. at 180.) A

reasonable person with Berry's training reviewing those records would

45

have understood that Harris did not delete any time and that Berry had simply failed to make her clock rings on October 10. Additionally, Berry herself was unable at the time to identify how much, if any, additional time she worked: She declined her own union's request to submit a PS Form 1260 (R. 28, Brim dep. at 466, 480; R. 32-5, letter at 864); refused management's request to sign a PS Form 1260 because she did not want to "guesstimate" her time (R. 27, Berry dep at 275); and admitted in an EEO affidavit four months later that she was not aware of when she started work that day (R. 32-5, EEO aff. at 843). Furthermore, she conceded at her deposition that she still does not know what, if any, time was purportedly deleted. (R. 27, Berry dep. at 222.) Under these circumstances, a reasonable person in Berry's position would not have believed (just as Berry did not believe) that the Postal Service violated the FLSA by denying her overtime pay. *See Sloan*, 901 F.3d at 895–96 (holding that plaintiff did not engage in protected activity where her "allegations d[id] not plausibly support an inference that she held a good-faith belief that her disciplinary suspension violated her rights under the FLSA").

46

B. <u>There is no direct evidence of retaliation</u>.

Even assuming there was a protected activity, Berry fails to present a genuine issue of fact on the question of retaliation, via either direct or circumstantial evidence. "Direct evidence is evidence, which if believed, does not require an inference to conclude that unlawful retaliation motivated an employer's action." *Pettit*, 429 F. App'x at 534 (quoting *Spengler*, 615 F.3d at 491). Rather, direct evidence "*requires* the drawing of the conclusion that the defendant retaliated against the plaintiff." *Id.*; *see also Abbot v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003).

As the district court found, Berry did not adduce any direct evidence of retaliation. (R. 43, op. & order at 1520–21.) On appeal, Berry asserts that Harris's decision to enter time for Berry coupled with LaRosa's statement on October 27, 2017—that she would go back to carrying mail pending the completion of the investigation if she did not sign a PS Form 1260—constitutes direct evidence that she was returned to her normal position for filing a grievance. (Br. at 20–21.) Not so. Even if believed, this evidence does not require a conclusion that the

47

Postal Service took action against Berry for filing a union grievance. (*See* R. 43, op. & order at 1520–21.)

On the contrary, as the district court recognized, the cited evidence at most indicates that the Postal Service returned Berry to her carrier position because she refused to sign a PS Form 1260, which is not protected activity. (*See id.*) To conclude from this evidence that the Postal Service retaliated against Berry for filing a union grievance requires a very significant inference: namely, that LaRosa required Berry to sign a PS Form 1260 (or be returned to her carrier position) to punish her for filing a grievance.

But that inference is not only not necessary, it is contrary to the record evidence, which supports a conclusion that Berry was simply being required to comply with standard timekeeping procedures. (*See* R. 32-4, Eichelbrenner decl. at 714–15, 722 (noting that PS Form 1260 is required to document missing clock rings).) Berry's deposition testimony suggests that LaRosa was not requiring her to endorse Harris's inputs and that she had the option to write down other hours she thought she worked. (*See* R. 27, Berry dep. at 275 (stating that LaRosa asked her to "write down something" but she declined because she did not want to

guess). Moreover, according to Berry, LaRosa specifically said he was *not* punishing her for filing a grievance. (*Id.* at 270.) As the district court indicated, the reasonable inference, especially given the objective evidence that Harris had not deleted any clock rings, is that LaRosa was simply asking Berry to abide by the Postal Service's timekeeping requirements and document any additional time she worked through a PS Form 1260. (*See* R. 43, op. & order at 1521.) Because the evidence does not require a conclusion that the Postal Service retaliated against Berry, it is not direct evidence of retaliation. *Cf. Pettit*, 429 F. App'x at 534 (holding that email capping plaintiff's hours at 20 hours per week pending resolution of overtime issues was not direct evidence of retaliation where evidence required inference about defendant's intent).

C. <u>Berry cannot establish retaliation based on circumstantial evidence</u>.

Where a plaintiff relies on circumstantial evidence, the *McDonnell Douglas* burden-shifting analysis applies. *Adair v. Charter Cty. of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006). "To establish a *prima facie* case of retaliation, an employee must prove that (1) he or she engaged in a protected activity under the FLSA; (2) his or her exercise of this right was known by the employer; (3) thereafter, the employer took an

49

employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action." *Id.* If the employee makes a *prima facie* case, the burden then shifts to the employer to set forth a legitimate, non-discriminatory reason for the adverse employment action. *Id.* Finally, the burden shifts back to the employee to show by a preponderance of the evidence that the employer's "proffered reasons were not its true reasons, but merely a pretext for illegal discrimination." *Id.*

Berry's claim fails at each stage of the burden-shifting framework. She cannot satisfy the first or fourth prongs of her *prima facie* case— the evidence establishes that she did not engage in protected activity, *see supra* part II.A, and that revocation of her 204b temporary supervisor status was not causally connected to her grievance. Moreover, the Postal Service articulated a legitimate, non-discriminatory reason for returning Berry to her normal position, and Berry has adduced no evidence that this reason was pretextual.

      1.  *The decision to return Berry to her normal position was not causally connected to her grievance.*

To establish a causal connection, a plaintiff must produce sufficient evidence from which an inference can be drawn that the

adverse action would not have been taken had the plaintiff not engaged in protected activity. *Adair*, 452 F.3d at 490. Temporal proximity standing alone is generally insufficient to establish a causal connection between the protected activity and the adverse action. *Id.*; *see also Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448–49 (6th Cir. 2020). Moreover, an intervening cause, such as employee misconduct, that occurs "between [the] protected activity and an adverse employment action dispels any inference of causation." *Kenney*, 965 F.3d at 450 (holding complaints filed against plaintiff and other employees leaving because of plaintiff's management style constituted intervening events that justified adverse employment action); *see also Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 471 (6th Cir. 2012) (holding plaintiff's decision to leave work area without authorization after being frustrated with the handling of his complaints constituted intervening event that "extinguishe[d] any inference based on temporal proximity").

Here, Berry's persistence in making false claims that Harris had deleted her clock rings, despite being presented with documentary evidence to the contrary, is an intervening event that dispels any inference that the Postal Service returned her to a carrier position in

retaliation for filing a grievance. The Postal Service took no immediate action against Berry after she filed her grievance. Rather, the Postal Service only returned her to her normal position after she continued to make false allegations even though the investigation and her own union concluded that no deletions had occurred and that she had simply failed to clock in and out on October 10, 2017. (R. 32-2. Harris decl. at 703.) Because the undisputed evidence establishes that it was Berry's persistent unfounded behavior following her grievance, and not the filing of the grievance, that caused the Postal Service to return her to her normal, non-supervisory position (*see id.*), Berry cannot carry her *prima facie* burden to show a causal connection. *Cf. McDonald v. UAW-GM Ctr. for Human Resources*, 738 F. App'x 848, 855–56 (6th Cir. 2018) (affirming summary judgment where evidence established that plaintiff's deliberate insubordination and use of profanity in the wake of her accommodation request were intervening causes of her suspension).

2.   *The undisputed evidence establishes that the Postal Service had a legitimate, nondiscriminatory reason for returning Berry to her normal position.*

Even if Berry could establish a *prima facie* case of retaliation, her claim still fails as a matter of law. It is well-established that the making

of a false allegation by an employee is a legitimate, non-discriminatory reason to take an adverse employment action against that employee. *See, e.g.*, *Carrethers v. McCarthy*, 817 F. App'x 88, 89 (6th Cir. 2020) (holding Army's honest belief that employee filed baseless complaints alleging harassment was a legitimate, nondiscriminatory reason for firing her); *Fuelling v. New Vision Med. Labs.*, 284 F. App'x 247 (6th Cir. 2008) (affirming summary judgment in favor of employer who disciplined and eventually terminated employee for filing false reports against other employees); *Kappen v. Ashley Med. Supply, Inc.*, 695 F. App'x 94, 97 (6th Cir. 2017) (holding employer's honest belief that employee encouraged co-worker to file a false sexual harassment claim was a legitimate, non-discriminatory reason for her termination); *see also Ladd v. Grand Trunk W. R.R., LLC*, 552 F.3d 495, 502–03 (6th Cir. 2009) (holding employer's belief that employee filed false injury report was a legitimate, non-discriminatory reason for her termination). Employers may take action against an employee for making false claims because "groundless complaints defame innocent coworkers, undermine trust in the workplace, and waste resources." *Carrethers*, 817 F. App'x at 89.

53

Here, the Postal Service returned Berry to her carrier position because her persistence in making false allegations rendered her ill-suited to continue as a 204b supervisor. Berry's own union determined the grievance was false and stated it would no longer be pursuing the grievance after reviewing the documentary evidence on the October 27 call. (R. 28, Brim dep. at 460–61; R. 37-3, Brim decl. at 1172.) Berry, however, refused to accept the evidence. According to the union representative, Berry remained adamant that, contrary to the objective evidence, she had made her clock rings, and the conversation continued in a heated manner with further accusations and arguing. (R. 28, Brim dep. at 462, 480.) Indeed, her appellate brief persists in her conspiratorial arguments that Harris "manipulated," "falsified," and "fabricated" her clock rings despite finally conceding that she did not, in fact, make her clock rings. (Br. at 14, 17–18.)

Harris testified that it was Berry's persistence in her false allegations despite the clear evidence to the contrary—and not Berry's filing of the grievance—that led to the breakdown in trust and the decision to return Berry to her carrier position:

> It had nothing to do with the grievance. It was because when I tried to verbally talk to her afterwards, after

54

she filed a grievance, me and the union steward are trying to talk to her and tell her, "hey, I did not delete your rings, hey, I didn't do anything wrong," she is still threatening to do something. She's still saying she wants something done to me. She's still accusing me of stealing from her and falsifying her clock rings. And she knew how serious that accusation was. She knew I could lose my job behind that. . . . So for the life of me, I never understood what her motive was, and I couldn't trust her.

(R. 31, Harris dep. at 582–83; *see also* R. 32-2, Harris decl. at 705.)

Accordingly, here, as in *Carrethers*, the employer took action not in retaliation but because it honestly believed that its employee was not operating in good faith when she continued to persist in her false allegations and that those false allegations irreparably damaged workplace trust. *See* 817 F. App'x at 89.

  3. *The Postal Service's proffered reason was not pretextual.*

  To defeat summary judgment on the basis of pretext, Berry must adduce evidence sufficient to create a genuine issue that "(1) the proffered reason had no factual basis, (2) the proffered reason did not actually motivate [the Postal Service's] action, or (3) the proffered reason was insufficient to motivate the action." *Adair*, 452 F.3d at 491; *see also Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009) (noting that pretext is a "commonsense inquiry" that asks whether or

not the "employer fire[d] the employee for the stated reason"). "If an employer has an honest belief in the nondiscriminatory basis upon which it has made its employment decision (*i.e.*, the adverse action), then the employee will not be able to establish pretext." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530–31 (6th Cir. 2012) (quotation omitted).[9]

On appeal, Berry does not contest that the Postal Service's belief that she was groundlessly persisting in false accusations can qualify as a legitimate, non-discriminatory reason for her ending her temporary 204b assignment. She does not dispute either that she persisted in her accusations that Harris deleted her time despite evidence to the contrary or that this created a lack of trust between her and Harris. She claims instead that the proffered reason was pretextual because Harris "lied and falsified Berry's time records." (Br. at 23.) According to Berry,

---

[9] Berry contends that it was inconsistent for the district court to find she had sustained her *prima facie* burden to establish a causal connection, but not to find that she had raised a genuine issue as to pretext. (*See* Br. at 25.) This Court has explained however, that evidence of a causal connection at a *prima facie* stage may be insufficient to raise a genuine issue as to pretext. *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. App'x 524, 535 (6th Cir. 2011). Even assuming that Berry adduced sufficient evidence to create a *prima facie* showing of a causal connection, she was required to produce additional evidence to rebut the Postal Service's proffered legitimate, nondiscriminatory reason. *See id.* She did not do so.

"Harris needed to get rid of Berry," presumably to cover-up this alleged falsification. (*Id.* at 24.)

The record is clear, however, that Harris did not lie or falsify Berry's time records. Rather, as the union representative explained to Berry on the October 27 call, Berry did not make her clock rings on October 10. (*See* R. 28, Brim dep. at 460–61; *see also* R. 32-4, Eichelbrenner decl. at 718–19.) Harris then inputted start and end times to match the amount of overtime Berry was authorized to work "to avoid the clock ring error and to ensure that [Berry] was paid for that day of work." (*See* R. 32-2, Harris decl. at 701.) Moreover, Harris testified that, had Berry ever submitted a PS Form 1260 or indicated that she had worked additional time, Harris would have ensured that Berry was paid for that additional time. (R. 29, Harris dep. at 581–82.) Berry did not do so, and even today cannot identify what if any additional time she worked. Because Harris did not falsify Berry's time records, but rather took action to ensure Berry got paid, Harris had no need to hide her actions—and no ulterior motivation for demoting Berry. *Cf. Fuelling v. New Vision Med. Labs., LLC*, 284 F. App'x 247, 257 (6th Cir. 2008) (rejecting claim of pretext based on employer's

57

"biased investigation" where the evidence established the investigation was not biased).

Berry's claim that Harris acted with pretext to obscure her own actions also fails because the record establishes that Harris fully disclosed her decision to input Berry's time to the union on the October 27 call. (*See* R. 28 Brim dep. at 461–65.) After reviewing the records, the union agreed with Harris and dropped the grievance. (*Id.*) It was only after Berry persisted in falsely accusing Harris of deleting her time that the Postal Service ended her temporary assignment and returned her to her normal position. And while Berry's appellate brief makes passing reference to instructions from Postmaster Vaccaro to limit overtime (Br. at 24), the undisputed evidence establishes that Harris understood Vaccaro to be directing her only to monitor overtime usage going forward. (R. 32-2, Harris decl. at 703–04.) Harris did not interpret Vaccaro to be telling her to retroactively delete accrued overtime, and she did not do so. (*Id.*) As such, those instructions do not provide a basis to cast doubt on the proffered explanation.

### III.    Berry's claims are untimely.

As explained in the preceding sections, the district court correctly concluded that neither Berry's overtime nor retaliation claims could survive summary judgment on their merits. This Court ultimately need not address those issues, however, as, for many of the same reasons, it is even more apparent that summary judgment is warranted on both claims based on the statute of limitations, a point argued by the parties below but not addressed by the district court. (*See* R. 32, def's mot. at 672–77; R. 38, pltf.'s response at 1195–98.)

The FLSA provides that a plaintiff must bring suit within two years of the alleged violation, unless the claim consists of a "willful violation," in which case the statute of limitations extends to three years. 29 U.S.C. § 255(a); *see also Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 187 (6th Cir. 2008). An FLSA violation is willful if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) (noting that Congress, in adopting a two-tiered statute of limitations, "intended to draw a significant distinction between ordinary and willful violations"). A

violation is not willful simply because the employer knew that the FLSA was "in the picture" or because the employer "acted without a reasonable basis for believing that it was complying with the statute." *Id.* A plaintiff bears the burden of proof on the issue of willfulness for statute of limitations purposes, and summary judgment in favor of defendant is appropriate where a plaintiff fails to adduce evidence sufficient to create a genuine issue as to willfulness. *See Parada v. Banco Indus. De Venezuela, C.A.,* 753 F.3d 62, 71 (2d Cir. 2014).

Here, Berry filed suit far more than two years after her claims accrued in October 2017. Accordingly, her suit is timely only if the Postal Service willfully violated the FLSA. This standard is not met for either of the claims because there is no evidence that the Postal Service knew or recklessly disregarded that any of its conduct violated the FLSA.

With respect to Berry's overtime claim, the undisputed evidence establishes that Berry never reported any overtime beyond the 7 hours and 48 minutes of overtime for which she was paid, that she refused requests to document her time through a PS Form 1260, and that she had (and continues to have) no specific recollection of the hours she

60

worked on October 10, 2017. (*See, e.g.*, R. 27, Berry dep. at 202–03, 222, 275.) Even if the Postal Service could somehow be deemed negligent for not divining Berry's claim that she worked additional hours, it certainly did not know or recklessly disregard any facts indicating that Berry worked additional hours on that day. Notably, every time Berry put the Postal Service on notice that she had worked overtime, the Postal Service paid her for the time she claimed. *Cf. White*, 699 F.3d at 877; *MacEachern*, 2017 WL 5466656, at *5. Moreover, Harris testified that if Berry had indicated she worked additional hours on October 10, Harris would have adjusted the time records to reflect Berry was due additional compensation. (R. 31, Harris dep. at 581.) Under these circumstances, no reasonable factfinder could conclude that the Postal Service willfully failed to pay Berry overtime.

There is likewise no evidence to suggest that the Postal Service willfully violated the FLSA's anti-retaliation provision when it returned Berry to her carrier position after she persisted in making false allegations that Harris deleted her time. As noted above, false allegations by an employee constitute a legitimate, non-discriminatory reason for taking an adverse employment action. *See Carrethers*, 817 F.

61

App'x at 89. Even if the Postal Service's actions could somehow be deemed to fall outside this caselaw, there is no indication in the record that the Postal Service knew or recklessly disregarded that its decision ran afoul of the FLSA. Rather, because it was reasonable to believe that the Postal Service could return Berry to her normal position due to her persistent false assertions, any alleged retaliation was, at a minimum, not willful.

# CONCLUSION

This Court should affirm the judgment of the district court.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney


/s/ Kevin Koller
KEVIN KOLLER
Assistant United States Attorney
221 E. Fourth Street
Suite 400
Cincinnati, Ohio 45202
(513) 684-3711
kevin.koller@usdoj.gov

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation provided in Rule 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure. The brief contains 12,800 words of Century Schoolbook (14 pt) proportional type. Word for Microsoft 365 is the word-processing software that I used to prepare this brief.

/s/ Kevin Koller
KEVIN KOLLER

## DESIGNATION OF RELEVANT
## DISTRICT COURT DOCUMENTS

The following are relevant under Sixth Circuit Rule 30(g).

| Record number | Description | PAGE ID# |
| --- | --- | --- |
| 1 | complaint | 1–10 |
| 12 | scheduling order | 39–41 |
| 27 | Berry deposition with exhibits | 72–1409 |
| 28 | Brim deposition | 443–481 |
| 29 | Peruzzi deposition | 482–505 |
| 31 | Harris deposition | 523–597 |
| 32 | motion with exhibits | 646–1034 |
| 33 | motion | 1035–1084 |
| 37 | response with exhibits | 1090–1179 |
| 38 | motion | 1180–1225 |
| 43 | opinion and order | 1502–1528 |
| 44 | judgment | 1529 |
| 47 | notice of appeal | 1537–1538 |

## CERTIFICATE OF SERVICE

I certify that this Brief for Defendant-Appellee United States Postal Service was served on counsel for Plaintiff-Appellant Berry by filing with the Court's CM/ECF system this 19th day of December, 2022.

/s/ Kevin Koller
KEVIN KOLLER